# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
|     Plaintiff, ) | Case No. 2:13-cr-00377-GMN-CWH |
| vs. ) | **ORDER** |
| MICHAEL STANLEY KAPLAN, M.D., ) | |
|     Defendant. ) | |

This matter is before the undersigned on Defendant Michael Stanley Kaplan, M.D.'s Motion for Change of Venue, or in the Alternative, to Submit Written Juror Questionnaire (#26), filed on April 21, 2014. The Court also considered the Government's Response (#31), filed on May 8, 2014 and Defendant's Reply (#37), filed on May 27, 2014.

## BACKGROUND

On October 2, 2013, a federal grand jury returned a two count indictment charging Defendant Michael Stanley Kaplan, M.D., ("Kaplan") with one count of conspiracy to commit adulteration in violation of 18 U.S.C. § 371 and one count of false statement in violation of 18 U.S.C. § 1001. Kaplan is a local physician licensed to practice medicine in the State of Nevada and specializing in the practice of urology. *See* Def.'s Mot. #26 at 2:18-19. He operates a medical practice known as "Green Valley Urology" ("GVU") with offices located in Henderson and Las Vegas, Nevada. Count One of the indictment charges Kaplan with conspiracy to unlawfully reuse single-use needle guides during invasive prostate procedures.[1] There has been some media coverage, beginning in March of 2011 through October of 2013, by *CBS Las Vegas*, the *Las Vegas*

---

[1] Count Two of the indictment charges Kaplan with making a false statement to the Food and Drug Administration, Office of Criminal Investigations, but does not affect this Order and will not be addressed further.

*Review Journal*, and *Las Vegas Sun* concerning Kaplan's reuse of endocavity needle guides based on the Southern Nevada Health District's investigation into whether patients during December of 2010 to March 11, 2011 are at risk for HIV or Hepatitis C. *See* Def.'s Mot. #26 at Exs. M-T. Indeed, Kaplan paid for an advertisement in the *Las Vegas Review Journal* to address his reuse of single-use needle guides. *See* Def.'s Mot. #26 at Ex. N. Some of the articles, or comments to the articles, reference a prior unrelated incident of reusing syringes and single-dose vials. *See* Def.'s Mot. #26 at Exs. M-T.

In 2008, approximately 40,000 patients in southern Nevada were informed that they may have been exposed to Hepatitis C and/or HIV during procedures performed between March 2004 and January 11, 2008 at the Endoscopy Center of Southern Nevada ("Endoscopy Center"). *See* Def.'s Mot. #26 at Ex. B. The Southern Nevada Health District found that the exposure was the result of unsafe practices at the Endoscopy Center such as reusing unsterilized syringes and single dose vials of propofol. *See* Def.'s Mot. #26 at Exs. C and D. Multiple lawsuits were filed in Las Vegas regarding the Endoscopy Center's practices, which resulted in millions of dollars of liability for the manufacturer and distributors of propofol. *See* Def.'s Mot. #26 at Exs. E and F. Additionally, Dipak Desai, M.D., ("Desai"), a physician at the Endoscopy Center, was criminally charged by the State of Nevada in June of 2010 for acts related to the hepatitis C outbreak, convicted by a jury in July of 2013, and sentenced to life in prison in October of 2013. *See* Def.'s Mot. #26 at Exs. G, I, and J. The *Las Vegas Review Journal* and *Las Vegas Sun* provided media coverage of the Endoscopy Clinic and Desai's unsanitary disinfection practices and related lawsuits through articles published in 2008 through 2013. *See* Def.'s Mot. #26 at Exs. B-L. Additionally, Desai was charged with billing fraud in a federal case that is ongoing and briefly mentioned in a *Las Vegas Sun* article on March 28, 2014. *See* Def.'s Mot. #26 at Ex. L.

In the instant Motion, Kaplan requests transfer of this action to another district or to Reno due to the presumed prejudice of the Las Vegas community toward doctors who are alleged to have unlawfully reused single-use medical devices. *See* Def.'s Reply #37 at 7. He cites to the aforementioned media coverage, including online readers' comments, as drawing a link from Kaplan to the Desai incident. *See* Def.'s Mot. #26 at 7-8. In the alternative, Kaplan requests that

this Court allow him to submit a jury questionnaire in an effort to effectively detect and avoid any prejudice that is harbored by the members of the Las Vegas community who are called for jury service in this case. *Id.*

In response, the Government claims that this is not one of those "extreme cases" for which a change of venue is appropriate because the pre-trial publicity generated in this case has not compromised Kaplan's right to an impartial jury. Govt.'s Resp. #31 at 1:21-23. The Government argues that all three of the relevant factors weigh against transferring this case because there is a large and diverse jury pool, the nature of the publicity was not blatantly prejudicial, and the media coverage of Kaplan was factually distinct and distant in time. *Id.* at 4-8. Additionally, the Government argues that Kaplan failed to justify the need for a jury questionnaire. However, the Government requests that if the Court exercises its discretion to allow for a jury questionnaire, then it be given the opportunity to comment and submit questions. *Id*. at 8:15-17.

### **DISCUSSION**

The Sixth Amendment to the Constitution of the United States guarantees a criminal defendant "the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. Amend. VI. Similarly, Federal Rule of Criminal Procedure 18 provides that, unless permitted otherwise, "the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18. Federal Rule of Criminal Procedure 21 permits a defendant to file a motion to transfer venue from the venue determined by Rule 18 to another district or within a district.

A district court has broad discretion in deciding a motion to transfer venue. *See United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996). However, the motion must be granted "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim P. 21. For example, the court may be "unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere." *Hayes v. Ayers*, 632 F.3d 500, 507 (9th Cir. 2011) (*citing Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988). Accordingly, if a defendant's request demonstrates extraordinary local prejudice will prevent a fair trial, then due process requires

1  transfer of the action to a different district or within the district.

2  A defendant must demonstrate either actual or presumed prejudice to justify a venue transfer. *See Skilling v. United States*, 561 U.S. 358 (2010). To establish actual prejudice, a defendant must demonstrate that the jurors exhibited "actual partiality or hostility that could not be laid aside." *Sherwood*, 98 F.3d at 410. However, jurors are not required to be "totally ignorant of the facts and issues involved." *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961). It is sufficient if the juror "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* (citations omitted).

"Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Harris*, 885 F.2d at 1361. Prejudice is rarely presumed because "saturation" requires conditions found in only "extreme situations." *Sherwood*, 98 F.3d at 410. As a result, the presumed prejudice standard is extremely difficult to meet even in cases with extensive media coverage. *See Rideau v. Louisiana*, 373 U.S. 723 (1963) (finding presumed prejudice based on defendant's alleged confession being televised prior to trial); *see also United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998) (noting the presumptive prejudice standard recognized in *Rideau* is only rarely applicable and reserved for an extreme situation). The Supreme Court has identified three factors to determine whether or not there is presumed prejudice: (1) the size and characteristics of the community in which the crime occurred, (2) the nature of the publicity, focusing on whether the disseminated information was "blatantly prejudicial," and (3) the passage of time between the news coverage and the start of trial. *Skilling* at 382-383.

**I.      Kaplan Has Failed to Demonstrate Presumed Prejudice.**

Kaplan's request to transfer venue is based on presumed rather than actual prejudice of individual jurors. He argues that the negative pre-trial publicity associated with the Endoscopy Center and Desai has resulted in pervasive community hostility against the alleged criminal activity at issue in this action. As a result, Kaplan claims that a presumption of prejudice has arisen necessitating a transfer to a different judicial district or within the District of Nevada to Reno. In contrast, the Government contends that Kaplan has failed to carry his burden of demonstrating

presumed prejudice and transfer is not justified. After careful consideration, the Court finds that Kaplan has not demonstrated presumed prejudice for three reasons: (1) the large size of the potential jury pool; (2) the factual nature of the negative publicity; and (3) the lengthy interval of time between the publicity and the start of trial.

### A. Southern Nevada's Large and Diverse Jury Pool Weighs Against Finding Presumed Prejudice.

Kaplan argues that, although the jury pool in southern Nevada is large, the effect of the publicity on the Endoscopy Center and Desai incident has reached "record proportions." Def.'s Mot. #26 at 11:25-26. He highlights news articles that describe that hepatitis outbreak as the largest in U.S. history, which resulted in the largest jury award in Nevada history. *Id.* at 11-12. As such, Kaplan contends that an event of such a magnitude is not likely to be forgotten by the local community and has generated a general animus against the alleged criminal activity in this action.

In contrast, the Government argues that Clark County's size cuts against a presumption of prejudice throughout the jury pool. *See* Govt.'s Resp. #31 at 4:10-12. The Government claims that Clark County has a population of over 2 million people and is more diverse than it has ever been. *Id.* at 4:16-18. It also highlights a Supreme Court decision that found Clark County's population of 600,000 people in 1988 to be large enough to find that "only the most damaging of information could give rise to any likelihood of prejudice." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1044 (1991).

The Court finds that the size of the jury pool is a factor that weighs against finding presumed prejudice. In *Skilling*, the Supreme Court determined that the negative media publicity of the collapse of the seventh largest company in the United States, Enron, in a city of over 4.5 million people eligible for jury duty, did not justify a transfer of venue. 561 U.S. 358. The Supreme Court stated that "[g]iven this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Id.* Furthermore, the Supreme Court explicitly stated that the "sheer number of victims did not trigger a presumption of prejudice." *Id.* at 384 (citations and internal quotations omitted). Similar to *Skilling*, the Court finds that the size and diversity of the jury pool in southern Nevada makes it likely that the Court would be able to select

1  twelve impartial jurors. *Id.* Although Kaplan alleges that the potential jury pool has been saturated
2  with negative pre-trial publicity, the Court is not convinced. As will be discussed further, the pre-
3  trial publicity regarding Kaplan's actions was isolated to eight articles over three years, with most
4  published in March of 2011. Furthermore, the eleven other articles written about the Endoscopy
5  Center and Desai incident were spread out over 2008 through March of 2014, a period of six years.
6  Additionally, Kaplan has presented no evidence as to what percentage of the population reads
7  online news articles posted on the *CBS Las Vegas*, the *Las Vegas Review Journal*, and *Las Vegas*
8  *Sun* websites and therefore, may have been informed about the health and safety dangers of reusing
9  single-use medical devices. Accordingly, the Court concludes that Kaplan's proffered evidence is
10 insufficient to find southern Nevada's large jury pool to be saturated with prejudicial and
11 inflammatory media publicity about Kaplan's alleged crimes. *See*, *Mu'Min v. Virginia*, 500 U.S.
12 415, 429 (1991) (finding no presumed prejudice in a community with a population of 182,537
13 people); *compare Irvin*, 366 U.S. at 729 (finding presumed prejudice in a community with a
14 population of 30,000 when details of defendant's confession and unaccepted offer to plead guilty
15 were in newspapers delivered to 95% of the population in addition to extensive television and radio
16 station coverage); *Rideau*, 373 U.S. 723 (finding presumed prejudice in a community of 150,000
17 people when over 90,000 had seen a televised broadcast, repeated three times, of defendant's
18 alleged confession).

19       **B.**    **The Factual Nature of the Negative Publicity Weighs Against Finding**
20             **Presumed Prejudice.**

21     Kaplan argues that the news articles and reader comments have drawn a direct, deleterious
22 link between the Endoscopy Center and Desai incident and Kaplan. *See* Def.'s Mot. #26 at 7:18-
23 21. To bolster that claim, Kaplan proffered nineteen media reports to establish the similarities
24 between the allegations brought against Kaplan and the Endoscopy Center and Desai incident. *See*
25 Def.'s Mot. #26 at Exs. B-T. Further, Kaplan highlights multiple articles that reference and
26 compare Kaplan and the Endoscopy Center and Desai incident. *See* Def.'s Mot. #26 at 8:6-23.
27     The Government argues that the pre-trial publicity identified by Kaplan will have a limited
28 impact on the potential jury because of the factual rather than prejudicial nature of the coverage.

1    The Government highlights the fact that the articles are not editorials or other opinion pieces
2    speculating about Kaplan's guilt, only one references the indictment, and none comment on the
3    evidence or proof at trial. *See* Govt.'s Resp. #31 at 6:8-10. In addition, the Government
4    underscores the fact that some of the articles on Kaplan do not mention the Endoscopy Center or
5    Desai or even refer to the incidents as unrelated. *See* Govt.'s Resp. #31 at 6:11-14. Further, the
6    Government points out one article that distinguishes the facts of this action because the risk of
7    disease transmission was categorized as low and testing was recommended as merely a
8    precautionary measure. *See* Govt.'s Resp. #31 at fn. 7. Indeed, the Government notes that Exhibits
9    M through S are neutral reports of actions taken by the Southern Nevada Health District. *See*
10   Govt.'s Resp. #31 at 6:6-8. Finally, the Government notes that Kaplan took out a large
11   advertisement in the *Las Vegas Review Journal* discussing his integrity and standard of care. *See*
12   Def.'s Mot. #26 at Ex. N.
13       The Court finds that the proffered evidence is not the type of inflammatory media coverage
14   that justifies a change of venue. Overall, the Court finds the publicity to be largely factual rather
15   than blatantly prejudicial. *See United States. v. W.R. Grace*, 408 F.Supp.2d 998, 1015 (D. Mont
16   2005) (citing Ninth Circuit cases that have emphasized the factual nature of news coverage in
17   upholding the denial of a motion to change venue). The news articles contain "no confession or
18   other blatantly prejudicial information of the type readers or viewers could not reasonably be
19   expected to shut from sight." *Skilling*, 561 U.S. at 382; *compare Irvin*, 366 U.S. at 725-26 (media
20   coverage referred to defendant's criminal history, association with other murders, and reported
21   confession was published the day before the trial). Further, the articles do not speculate about
22   Kaplan's guilt. *See Ainsworth v. Calderone*, 138 F.3d 787 (9th Cir. 1998). The only article to
23   contain an opinion is that expressed by Kaplan's counsel on behalf of Kaplan explaining the
24   advertisement Kaplan paid for to address his actions. *See* Def.'s Mot. #26 at Ex. N.
25       Moreover, the most negative publicity proffered by Kaplan consists of some online reader
26   comments. Kaplan claims that the comments are of an inflammatory, non-factual, nature sufficient
27
28

to warrant transfer of venue.[2] *See* Def.'s Mot. #26 at 9:22-24. However, the Court finds that a few scattered online reader comments are insufficient to constitute blatantly prejudicial information that would have been seen by a substantial percentage of the jury pool. Furthermore, the Court is concerned with the reliability of the contents of the postings and notes that much of Kaplan's argument is speculative as to how many people were affected by the Endoscopy Center and Desai incident. Further, the Court finds that the number of comments is not voluminous enough to suggest that they could serve as a proxy for the entire venire. *See Embry v. Guirbino,* 2008 WL 80709 (E.D. Cal. 2008) (finding that internet comments do adequately demonstrate the feelings of the potential venire where the comments were limited in authorship and dissemination). Accordingly, the Court finds the online reader comments identified by Kaplan to be insufficient evidence of blatantly prejudicial publicity requiring a transfer of venue.

### C. The Passage of Time Weighs Against Finding Presumed Prejudice.

Kaplan argues that publicity related to the Endoscopy Center and Desai incident continues into 2014 and therefore, the community continues to be subjected to inflammatory publicity. He highlights an article from March 28, 2014 noting Desai's indictment in a pending federal case and fact that Desai's trial is scheduled to begin immediately prior to Kaplan's trial. *See* Def.'s Mot. #26 at Ex. L.[3] Further, Kaplan cites instances where local doctors have commented that the Endoscopy Center and Desai incident has produced a lasting effect on the public's perception of doctors and the medical profession. *Id.* at 6:24-28 and 7:1-10.

The Government argues that the examples that Kaplan provides as proof that the community is still saturated with negative publicity do not rise to the level of the "extreme case" warranting transfer of venue. *Skilling*, 561 U.S. at 381. Specifically, the Government argues that

---

[2] Kaplan cites several examples of reader comments that make disparaging remarks about Kaplan. In contrast, the Government underscores several examples of reader comments that compliment Kaplan. A detailed analysis of the substance and credibility of the reader comments is not necessary at this time.

[3] The Court notes that Desai's trial date is not final, but if it were to commence in the week prior to Kaplan's trial, it is unlikely that members of the jury not selected for Desai's trial would be selected for Kaplan's trial. However, such a concern could easily be addressed by the District Judge in *voir dire*.

1  the lapse in time between news coverage and Kaplan's trial date will have a profound effect on the
2  community and potential jury opinions. *See Patton v. Yount*, 467 U.S. 1025, 1033 (1984) (finding
3  the prejudicial publicity was greatly diminished by the passage of a year and a half even with
4  newspaper coverage averaging of less than one article per month); *see also W.R. Grace*, 470
5  F.Supp.2d at 1009 (finding that the Court should "give little weight to coverage that took place
6  several years ago and . . . confine its assessment of prejudice primarily to the more recent
7  publicity."); *see also Harris*, 885 F.2d at 1362 (finding that the negative publicity had "dissipated
8  considerably by the time of jury selection four months later.").

   The Court agrees that the lengthy interval of time between the start of the publicity and the start of Kaplan's trial weighs against finding presumed prejudice. Kaplan proffered eleven news articles published in February of 2008 through March of 2014 covering the Endoscopy Center and Desai incident without any mention of Kaplan. *See* Def.'s Mot. #26 at Exs. B-L. Of the eight articles covering Kaplan, seven were published in 2011 and one was published October of 2013. In considering the entire six year period from February of 2008 to March of 2014, only nineteen articles were published referencing reusing single-use medical devices, which averages to about three articles a year. Further, a detailed analysis of the proffered articles reveals that the majority of the coverage of Kaplan was focused in 2011 and the majority of the coverage of the Endoscopy Center and Desai incident ended in October of 2013. Accordingly, the Court finds that this amount of news coverage is neither substantial nor pervasive. Sufficient passage of time has occurred to dissipate intensity and quantity of the publicity regarding reuse of single-use medical devices to warrant finding this factor to weigh against a conclusion of presumed prejudice.

   Accordingly, the Court finds that a transfer of venue is not warranted for three reasons: (1) the jury pool is large and diverse, (2) the negative publicity has been primarily factual in nature rather than blatantly prejudicial, and (3) the negative publicity has dissipated substantially. Accordingly, the Court will deny Defendant's Motion without prejudice because all three *Skilling*

factors weigh against transferring venue for presumed prejudice at this time.[4]  561 U.S. 358.

## II. Kaplan Has Not Demonstrated That a Written Juror Questionnaire Is Necessary to Detect and Avoid Actual Prejudice.

Federal Rule of Criminal Procedure 24 delegates the responsibility of selecting a jury to the court. Specifically, the Court "may examine prospective jurors" and "must permit the attorneys for the parties to ask further questions that the court considers proper; or submit further questions that the court may ask if it considers them proper." Fed. R. Crim. P. 24(a). The Supreme Court has "stressed the wide discretion granted to the trial court in conducting voir dire in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias." *Mu'Min*, 500 U.S. at 427.

Kaplan argues that, as an alternative to transferring venue, the Court should require a written juror questionnaire to ensure that actual prejudice is avoided. He claims that the use of a questionnaire would expedite the jury selection process and enhance the fairness of the proceedings. *See* Def.'s Mot. #26 at 14:16-23. Further, Kaplan cites to *Skilling* as the Supreme Court's implicit endorsement of "a comprehensive jury questionnaire to aid counsel in efforts to ensure that prejudice and partiality could be discovered and that the constitutional imperative of an impartial jury could be achieved." *Id.* at 13:20-22. In response, the Government argues that Kaplan has failed to demonstrate that the Court's typical *voir dire* procedure will be inadequate to ensure an impartial panel of jurors. However, the Government seeks to submit comments and questions if a questionnaire ordered to be provided to the jury pool.

Based on the Court's finding of no presumed prejudice, the Court exercises its discretion to deny Kaplan's alternative request for a written juror questionnaire. There are several options available to the District Judge during the *voir dire* process that can assist in detecting actual prejudice in the jury pool. The District Judge can ask specific questions to detect knowledge about this case or the Endoscopy Center and Desai incident and excuse any juror who reveals exposure to

---

[4] The Court will deny Defendant's motion without prejudice so as to not preclude him from renewing it for actual or presumed prejudice when the District Judge conducts *voir dire* and more information about the jury pool and actual jurors is known.

prejudicial pre-trial publicity at that time. *See Harris*, 885 F.2d at 1364. Also, the District Judge may elect to question the jurors individually to avoid exposing the other venire members to prejudicial information. *See Mu'Min,* 500 U.S. at 419. Additionally, the Court may allow the attorneys for the parties to ask follow-up questions and submit questions in a joint pretrial order or separate trial briefs. *See Skilling,* 561 U.S. at 389. The variety of options available to the District Judge to identify actual prejudice provides sufficient assurance to the Court that a written jury questionnaire, although a potentially helpful guide, is not a necessary tool to ensure an impartial jury. Accordingly, the Court finds that Kaplan has failed demonstrate that the typical *voir dire* procedures will be ineffective to ensure that Kaplan's trial has an impartial panel of jurors. It will deny his request for a written juror questionnaire at this time, without prejudice.

In conclusion, the Court finds that Kaplan has failed to meet the extremely difficult standard of presumed prejudice that warrants a transfer of venue. Further, the Court exercises its discretion to find that a written juror questionnaire is not necessary at this time to prevent actual prejudice.

Based on the foregoing and good cause appearing therefore,

**IT IS HEREBY ORDERED** that Defendant Michael Stanley Kaplan, M.D.'s Motion for Change of Venue, or in the Alternative, to Submit Written Juror Questionnaire (#26) is **denied without prejudice**.

DATED this 8th day of July, 2014.

_____
**C.W. Hoffman, Jr.**
**United States Magistrate Judge**